IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOANNE CAMPBELL | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| JEFFERSON UNIVERSITY PHYSICIANS | : | NO. 13-3006 |

MEMORANDUM

Dalzell, J.                                                          May 27, 2014

## I.      Introduction

Joanne Campbell brings this action against her former employer, Jefferson
University Physicians ("JUP")[1], alleging violations of her rights under the Family and Medical
Leave Act ("FMLA"), 29 U.S.C. §§ 2601, et seq.  JUP now moves for summary judgment on
Campbell's FMLA claim, and we exercise jurisdiction pursuant to 28 U.S.C. § 1331.

In her amended complaint, Campbell claimed that JUP "interfered with,
restrained, discriminated against[,] and denied Plaintiff's entitlement to FMLA benefits" by, inter
alia, "terminating Plaintiff", "denying Plaintiff her entitlement to full FMLA benefits",
"discriminately ending Plaintiff's right to leave", and "discriminating against Plaintiff for taking
FMLA leave", Am. Comp. at ¶ 26.

JUP argues that summary judgment is warranted because it contends that
Campbell's interference and retaliation claims depend on her "demonstrably false assertion that
the third-party administrator for JUP's FMLA program told her that her employment at JUP had
been terminated."  Def. MSJ at 1.  According to JUP, Campbell stopped reporting for work and

---

[1] Campbell initially sued both JUP and Matrix Absence Management, Inc. ("Matrix"), JUP's
third-party administrator for FMLA claims.  We granted Matrix's motion to dismiss, finding that
Campbell had not alleged facts sufficient to show that Matrix was an employer within the
FMLA's meaning.

following JUP's "call-off protocol", and "no manager of JUP ever told her she had been terminated until after she removed her belongings and said goodbye to her co-workers." Id. JUP argues that Campbell was thus "not denied any rights under the FMLA as she received all of the leave to which she was entitled", and that she was not "denied reinstatement as she never sought to return to her position". JUP also contends that Campbell was not the victim of retaliation because "[t]here is no causal connection between Plaintiff's FMLA leave and the end of her employment, nor is there any evidence of pretext on any level." Id. at 1-2.

In her opposition to the motion for summary judgment Campbell does not address retaliation, discussing only interference with her FMLA rights. In her contentions as to the interference claim in her response to JUP's summary judgment motion, Campbell raises for the first time the argument that JUP interfered with her FMLA rights by improperly conducting the recertification process that 29 C.F.R. § 825.308 provides her. See Pl. Resp. at 3.

Campbell now contends that

The crux of this case is whether Defendant JUP, by and through its designated third party administrator for FMLA, interfered with Plaintiff's rights under the FMLA, by not informing her of her rights to a recertification, by not informing her of the consequences of not obtaining the recertification, denying her the full amount of time to obtain the recertification, and by terminating her before she had opportunity to obtain a recertification.

Id.

Campbell argues that there are genuine disputes over whether she violated any company call-out policy, whether she was fired, and whether her continuing absences from work subjected her to termination. Id. at 4-5.

## II.     <u>Standard of Review</u>

A party moving for summary judgment bears the initial burden of informing the district court of the basis for its argument that there is no genuine issue of material fact by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact", <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

If the moving party meets this initial burden, Fed. R. Civ. P. 56 then obliges "the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  <u>Id.</u> at 324.

A factual dispute is genuine

> [I]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party. . . . The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 252 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law".  <u>Id.</u> at 248.

We "must draw all reasonable inferences in favor of the nonmoving party, and [we] may not make credibility determinations or weigh the evidence."  <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000), cited in <u>Amour v. County of Beaver</u>, 271 F.3d 417, 420 (3d Cir. 2001).

**III.   Facts**

In rehearsing the facts in this matter we refer primarily to JUP's Statement of Material Facts (hereinafter "SMF").  Campbell admitted all but one of these items -- she contests only the date of her termination.  We will note those instances below where Campbell has submitted additional facts relevant to our analysis.

JUP hired Campbell as a Patient Registrar in the Department of Obstetrics and Gynecology on June 5, 2005, and she worked there until January of 2013.  Def. Statement of Material Facts (hereinafter "SMF") at ¶¶ 1, 3.  Campbell reported to Nurse Manager Leslie Kinkler, who reported to Fran Herr, Administrator for the Department of Obstetrics and Gynecology and Campbell's "second-level supervisor."  Id. at ¶¶ 4-5.

On January 22, 2008 Campbell's husband, Darryl Maxwell, was diagnosed with chronic grand mal seizures.  Id. at ¶ 13.  These seizures occur occasionally and last for about two to four minutes, during which Maxwell suffers loss of consciousness and motor control.  Id. at ¶ 14.  After the seizures, Maxwell returns to a normal level of functioning within six to eight hours, during which he sleeps and Campbell and her children check on him to make sure he has not had another seizure.  Id. at ¶¶ 16-17.  Maxwell typically does not require hospitalization or ongoing care after this recovery period.  Id. at ¶ 19.

JUP has contracted with Matrix to administer employee leaves of absence.  Id. at ¶ 10.  Campbell requested and received intermittent use of FMLA leave from 2008 through 2012 to care for Maxwell.  On June 12, 2012 Maxwell's treating neurologist, Dr. Mintzer, filled out an FMLA re-certification form in which he wrote that Campbell may need intermittent FMLA leave for one seizure in a twelve-month period, for one day per episode.  Id. at ¶ 21.  On July 24, 2012,

Matrix told Campbell that JUP had approved her to take FMLA leave for one event per year, with a duration of four days per event.  Id. at ¶ 22.

JUP's absentee policy -- contained in an employee handbook Campbell received -- provided that on any day an employee would be absent she had to report that absence by making two phone calls -- one to her supervisor, to whom she was required to speak directly rather than leave a message, and the other to Matrix through its call-in line.  Id. at ¶¶ 6-11.

During the course of Campbell's employment, JUP had expressed concern about the number and pattern of her absences.  Campbell received several warnings for "patterned absenteeism" in 2010 and 2012, and on December 3, 2012, she was disciplined for two unscheduled days off in November of 2012.  Id. at ¶¶ 25-31.  On that day Campbell signed a disciplinary form containing a warning that "any further unscheduled time off before November 12, 2013 would result in progressive discipline including termination of her employment."  Id. at ¶ 32 (quoting Campbell Dep., SMF Ex. A at 139:18 - 141:16).  On December 18, 2012 JUP disciplined Campbell for unscheduled lateness and informed her that any further lateness, early departures, or unscheduled absences before December of 2013 would result in termination of her employment.  SMF at ¶ 34.

On the afternoon of Sunday, January 13, 2013, Maxwell had a seizure.  Campbell did not report to work the next day on the ground that Maxwell was "still weak" from his seizure.  She called both JUP and Matrix to report this absence.  Id. at ¶¶ 36-38.  When she spoke with Kinkler, her supervisor, she said she was "on FMLA with [her] husband."  Id.

Campbell also did not come to work on January 15, 2013 saying that she needed a leave of absence to monitor Maxwell for her "own peace of mind . . . to make sure for [her] own peace of mind that he was going to be okay the whole eight hours that [she] was going to be

gone." Campbell Dep. at 152:9 - 152:22. Campbell testified that she called Matrix that day, and a Matrix representative told her she had been fired. Id. at 153:11-12. She testified that she then called Kinkler and did not discuss the termination with her, but instead said, "I'm on FMLA with my husband, Darryl Maxwell, for Monday and Tuesday. I said, most likely I will be returning to work on Wednesday." Id. at 154:18-21.

On Wednesday, January 16, 2013, Campbell put on her uniform and was on her way to work when she received a call from her daughter saying that Maxwell had suffered another seizure. Id. at 155:19-156:7. Campbell returned home to take care of Maxwell, and she called Matrix and Kinkler to report her absence. She did not discuss any termination with Kinkler. Id. at 153:1-154:6.

Campbell testified that she did not go to work on Thursday because she had been fired on Tuesday, January 15, 2013. Id. at 163:21 - 164:3. She nevertheless called in to both Matrix and JUP. See id. at 104: 19 - 105:10. She testified that she did not go to work on January 18, 2013 for the same reason. Id. at 165:22 - 24. On that day she called both Matrix and Kinkler, and she testified that Matrix again told her she had been fired, but Kinkler did not discuss it.[2] Id. at 166:8 - 21. During her deposition, Campbell recalled her conversation with Kinkler that day: Kinkler said, "oh, are you still using FMLA for your husband for this week, I said yes, and she was like, oh, okay, good-bye." Id. at 167:16-18.

Campbell testified that she did not go to work on Monday, January 21, 2013 because she had been fired. She did not call in to report her absence, and in her deposition she testified, "I didn't feel as though I had a reason to keep calling them back if I had already been

---

[2] Campbell admits all facts in this portion of the defendant's recitation, adding that on January 18, 2013, "Plaintiff informed her supervisor, Leslie Kinkler, via telephone, that she was using her FMLA leave." Pl. Resp. at ¶¶ 35-60. The portions of the record to which plaintiff cites -- pages 112-13 of Campbell's deposition and page 95 of Kinkler's deposition -- do not support this contention.

terminated." Id. at 168:6-8.  Campbell testified that, at this point, Kinkler still had not said she

was fired.  Id. at 168:15-22.  She testified further that on this day she was no longer taking care

of Maxwell.  Id. at 167:24-168:2.  Campbell did not report to work from January 21 - 25, 2013

and she did not call Matrix to report her absences on those days.  SMF at ¶¶ 65-66.

JUP avers, and Campbell does not dispute, that "Matrix produced audio

recordings of Ms. Campbell's calls to Matrix on January 14th, 15th, 16th, 17th, and 18th", and

that "Ms. Campbell's employment status is not discussed on any of the calls made by Ms.

Campbell to Matrix" on those days.  Id. at ¶¶ 111, 117.  At no point in the calls did any

representative of Matrix "communicate[] to Ms. Campbell . . . that her employment at JUP had

been terminated." Id. at ¶ 118.

Kathleen Simmons, a Claims Administrator for Matrix, testified that on January

22, 2013 Matrix initiated a recertification process for Campbell.  See Simmons Dep., Pl. Resp.

Ex. B, at 138:18 - 139:18.  Simmons testified that she "left [a] message about the approval

parameters, and . . . gave her 15 days and . . . faxed the physician to get the recertification." Id.

at 138:24 - 139:4.  Campbell avers in her opposition to JUP's motion that she never received

notice of the recertification process.  Pl. Resp. in Opp. at 1.

Separately, on January 22, 2013, Herr sent Campbell a letter saying that Campbell

had been absent since January 14, 2013 and Campbell's "continued absence [was] without

authorization."  SMF at ¶ 67 (quoting January 22, 2013 letter from Herr to Campbell).  Herr told

Campbell to contact JUP about her intentions regarding her employment, and that failure to do so

by the close of business on January 25, 2013 would result in termination.  Id. at ¶ 69.  Campbell

received the letter that day, but she stated that she did not give it her "whole, hundred percent,

focused attention because [she] was doing other things."  Campbell Dep. at 173:10-12.  She

called Herr the day after receiving the letter, January 23, and she recalled their conversation during her deposition:

> [MR. STEINBERG]:
>
> So when you spoke to Ms. Herr on -- well, when you spoke to Ms. Herr the first time following this letter, tell me in as very much detail as possible -- as much detail as possible what you said to her and what she said to you.
>
> [MS. CAMPBELL]:
>
> Okay.  What I said to her was -- she -- what she said to me was, Joanne, explain to me what happened and, you know, what's going on, so I explained to her the situation, that I called Matrix, said I was going on FMLA, called Leslie Kinkler.  She, in response, was like, okay, did you follow protocol?  I called the people I was supposed to call, I took the necessary steps that I'm supposed to take to protect my job.  I did all that.  Then she told -- Fran Herr, the administrator, told me that she was going to see -- being that she was the administrator, she was going to see what she could do to stop the termination, but in closing the conversation termination-wise had already been taking place and had --
>
> Q:   Ms. Herr told you that?
>
> A:   Yes, that --
>
> Q:   I apologize.  You -- I thought just two minutes ago you said that Ms. Herr didn't tell you anything about being terminated?
>
> A:   Yes, she said the process.  She didn't say terminated, but she said the process of termination has already been taking place.  So, process, I'm thinking do I still have my job, is it still there.  And, no, she said, well, give me a little bit of time, I'll get back in contact with you, but I never heard anything back from her.
>
> . . .

> Q:   So -- okay.
>       Why didn't you ask her and -- and really try to clarify what
>       she meant?
>
> A:   The only thing she said to me was -- after that was she was
>       going to see what she could do to stop the process of what
>       was going -- going on and that this shouldn't have happened
>       and not this way.  Those [were] her final words to me.

Id. at 176:8 - 178:21.

Campbell testified that "Fran Herr . . . said give her some time, she would call me back," id. at 180:8 - 10, and, when she didn't hear back from Herr, Campbell said she thought, "okay, well, my termination is -- it is what it is because I never heard back from my administrator, I never heard back from anyone else to tell me that my termination was wrong or that you still have your job.  I received none of that."  Id. at 180:12-17.  Campbell did not speak further to Herr or Kinkler about her employment status.  SMF at ¶ 77.

Campbell alleged that on January 28, 2013, a co-worker -- who was not in a supervisory role -- told Campbell that she had been "fired" and she should come to work to pick up her things.  Id. at ¶ 81.  Campbell says she responded by saying, "I'm on family medical leave with Darryl."  Campbell Dep. at 200:20-21.  Campbell did not go to work, nor did she call to report her absence, on Monday, January 28, or Tuesday, January 29, 2013.  SMF at ¶¶ 78-79, 84-85.  On Wednesday, January 30, Campbell went to work, collected her things, said goodbye to several co-workers, and left without speaking to either Herr or Kinkler about her termination.  Id. at ¶¶ 88-90.  At 7:27 a.m., Kinkler reported that, after clearing out her desk, Campbell had handed Kinkler her employee I.D. and said she "did not want to talk about it."  Id. at ¶ 91.

JUP then sent Campbell a letter dated January 30, 2013, saying that Campbell's employment at JUP was terminated for "job abandonment" as a result of her failure to speak to

Matrix or JUP about her absences on January 28 and 29, 2013.  Id. at ¶¶ 92-93.  In her

deposition, Herr testified that Campbell's employment with JUP "came to an end" because

"[s]he came in to the office and cleaned out her desk and left."  Herr Dep., Ex. M, at 26:8 - 13.

Kinkler similarly testified that Campbell was not terminated, but that her employment ended

because "[s]he handed [Kinkler] her ID badge."  Kinkler Dep., Ex. J, at 79:19 - 80:4.

JUP thus identifies January 30, 2013  as the date of plaintiff's termination, while

Campbell argues that she

> testified to being informed of her termination on at least three other
> occasions including being informed twice by personnel at Matrix
> Absence Management, Inc. (January 15, 2013 and January 18,
> [2013]), and by the Senior Administrator of her department at
> Defendant JUP, Frances Herr, who on January 23, 2013 informed
> Plaintiff that the processing of Plaintiff's termination had already
> taken place.

Pl. Resp. to SMF at ¶ 3.  Campbell's claim that Matrix personnel told her she had been fired

contradicts her admissions that "Ms. Campbell's employment status is not discussed on any of

the calls made by Ms. Campbell to Matrix on January 14th, 15th, 16th, 17th, or 18th" and that

"No representative of Matrix communicated to Ms. Campbell on January 14th, 15th, 16th, 17th,

or 18th that her employment at JUP had been terminated."  SMF at ¶¶ 117-18; Pl. Resp. at ¶¶

107-120.  Nevertheless, because the crux of Campbell's interference claim is that she was

terminated after Matrix began the recertification process on January 22, 2013, but before the

fifteen-day period for that process had elapsed in February of 2013, it is immaterial whether she

was fired on January 30, 2013 or sometime before.[3]

---

[3] JUP points out, and Campbell does not dispute, that Campbell has no evidence of other
employees who collected their things and left and were not considered to have resigned, nor does
she have evidence of other employees who missed two days of work without notifying JUP or
Matrix and continued to work.  SMF at ¶¶ 98-100.  Campbell testified that neither Herr nor
Kinkler ever said anything regarding her FMLA leave that Campbell found to be offensive or
derogatory.  Id. at ¶ 101.  JUP also notes that twelve other employees in its Department of

**IV.**     **Discussion**

   A.     The Family and Medical Leave Act

   The FMLA embodies a Congressional desire to "balance the demands of the workplace with the needs of families" and "to entitle employees to take reasonable leave" to care for family members with serious health conditions "in a manner that accommodates the legitimate interests of employers."  29 U.S.C. § 2601(b)(1) - (b)(3).  Under the FMLA, eligible employees "shall be entitled to a total of 12 workweeks of leave during any 12-month period" for the purpose of, inter alia, caring for a spouse with a serious health condition.  29 U.S.C. § 2612(a)(1).

   An employer may require an employee who seeks leave to care for a sick family member to provide a certification completed by a health care provider pursuant to 29 U.S.C. § 2613(a).  If the employer does so require, it must "(1) provide written notice to the employee that it requires such certification and (2) . . . advise the employee of the consequences of a failure to provide certification."  Peter v. Lincoln Technical Institute, Inc., 255 F. Supp. 2d 417, 439 (E.D. Pa. 2002) (Van Antwerpen, J.) (citing 29 C.F.R. § 825.305).

   After the initial certification, an employer may request recertification in connection with an employee's absence "no more often than every 30 days", 29 C.F.R. § 825.308(a), but "[i]n all cases, an employer may request a recertification of a medical condition every six months in connection with an absence by the employee."  29 C.F.R. § 825.308(b).  The recertification process resembles the initial certification process, see 29 C.F.R. § 823.308(e), and

---

Obstetrics and Gynecology, including two patient registrars, have used FMLA leave since 2011 and all but two employees continue to work for JUP.  Id. at ¶¶ 103-04.  The two employees who no longer work for JUP resigned voluntarily.  Id. at ¶ 106.  Because, as we explain herein, Campbell pursues only her interference claim and not her retaliation claim, these facts are not relevant to our analysis.

an employer must allow an employee "at least 15 calendar days after the employer's request" to submit the information.  29 C.F.R. § 825.308(d).

29 C.F.R. § 825.305(a) outlines the notice requirements when an employer seeks certification: "[a]n employer must give notice of a requirement for certification each time a certification is required; such notice must be written notice whenever required by § 825.300(c). An employer's oral request to an employee to furnish any subsequent certification is sufficient." § 825.305(a).  Section 825.300(c) concerns the "rights and responsibilities notice" employers must give employees "each time the eligibility notice is provided pursuant to paragraph (b) of this section." § 825.300(c)(1).  Employers must furnish an eligibility notice "[w]hen an employee requests FMLA leave, or when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason."  § 825.300(b)(1).  The notice requirement is triggered "at the commencement of the first instance of leave for each FMLA-qualifying reason in the applicable 12-month period", and "[a]ll FMLA absences for the same qualifying reason are considered a single leave and employee eligibility as to that reason for leave does not change during the applicable 12-month period." Id.  Because Campbell had received approval in June of 2012 for FMLA leave for the following twelve-month period, all events in January of 2013 were within this period, and so written notification was not required under the constellation of §§ 825.300(b), (c), and 825.305(a).

As our Court of Appeals has explained, the FMLA includes two distinct types of provisions to protect the rights it establishes -- retaliation and interference.  See, e.g., Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005).

Pursuant to the FMLA's "retaliation" provisions, an employer may not "discharge or in any other manner discriminate against" employees for their exercise of FMLA rights, §

2615(a)(2), nor may it "use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions", 29 C.F.R § 825.220(c).

Under its "interference" provision, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise," an employee's use of their rights under the FMLA. 29 U.S.C. § 2615(a)(1).

The FMLA regulations provide that "[a]ny violations of the Act or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the Act." 29 C.F.R. § 825.220. In light of this provision, courts have held that "[f]ailure to provide such notice and opportunity [to provide a certification] constitutes 'interfering with, restraining, or denying the exercise of rights provided by the Act.'" Peter, 255 F. Supp. 2d at 439.

But as Justice Kennedy noted for the Supreme Court in Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81 (2002), the broad sweep of the interference provision is limited by the principle that in order to prevail on an FMLA claim an employee must show prejudice resulting from the employer's violation:

> § 2617 provides no relief unless the employee has been prejudiced by the violation: The employer is liable only for compensation and benefits lost 'by reason of the violation,' § 2617(a)(1)(A)(i)(I), for other monetary losses sustained 'as a direct result of the violation,' § 2617(a)(1)(A)(i)(II), and for 'appropriate' equitable relief, including employment, reinstatement, and promotion, § 2617(a)(1)(B).

Ragsdale, 535 U.S. at 89. In other words, "[t]he remedy is tailored to the harm suffered", id. , and "[w]here a plaintiff is not harmed by an FMLA violation, Section 2617 provides no remedy, and summary judgment is appropriate." Armfield v. Key Plastics, LLC, No. 1:08-110, 2011 WL 3022253, at *7 (N.D. Ind. July 22, 2011). See also, e.g., Hilborn v. Cordaro, No. 3-06-0223,

2007 WL 2903453, at *7 (M.D. Pa. Sept. 28, 2007) (collecting cases for the proposition that "courts have determined that an employer's failure to [comply with FMLA provisions], without a showing of actual harm, is insufficient to state an FMLA interference claim").

In establishing prejudice a plaintiff must show that an employer's failure to comply with the statute and regulations "rendered [her] unable to exercise [an FMLA] right in a meaningful way, thereby causing injury." Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 143, (3d Cir. 2004).

     B.    Campbell's Retaliation Claim

In order to prevail on an FMLA retaliation claim, a plaintiff must show that "(1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights." Lichtenstein v. University of Pittsburgh Medical Center, 691 F.3d 294, 301-02 (3d Cir. 2012). Campbell here has submitted no direct evidence of discrimination, and, in analyzing claims based on circumstantial evidence we must employ the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See, e.g., Lichtenstein, 691 F.3d at 302. Under the McDonnell Douglas framework, Campbell bears the initial burden of making a prima facie case as to each element of her retaliation claim. Lichtenstein, 691 F.3d at 302. If she does so, the burden of production shifts to JUP to articulate a "legitimate, nondiscriminatory reason" for its decision. McDonnell Douglas, 411 U.S. at 802. If JUP provides such a reason, the burden then shifts back to Campbell to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably . . . disbelieve [the employer's] articulated legitimate reason." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). See also, e.g., Lichtenstein, 691 F.3d at 302.

As JUP points out, Campbell's complaint does not make clear under which theory she seeks relief.  JUP argues that Campbell cannot make out a prima facie case of retaliation, because she cannot identify any adverse employment decision that JUP made.

In her response to JUP's motion for summary judgment, Campbell does not address JUP's retaliation argument, and JUP argues that we should therefore consider any retaliation claim waived.  Def. Reply at 2.

Other district courts in our Circuit have found that waiver is "a necessary corollary" to the principle that summary judgment is appropriate where the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case."  Skirpan v. Pinnacle Health Hospitals, No. 1:07-CV-1703, 2010 WL 3632536, at *6 (M.D. Pa. Apr. 21, 2010) (quoting Celotex, 477 U.S. at 322).  Thus, when a plaintiff responds to a defendant's summary judgment motion but fails to address the substance of any challenge to particular claims, that failure "constitutes an abandonment of th[o]se causes of action and essentially acts as a waiver of these issues."  Id.  See also, e.g., Brenner v. Township of Moorestown, No. 09-219, 2011 WL 1882394, at * 11 (D.N.J. May 17, 2011) (collecting cases).

Because Campbell has failed to address JUP's retaliation argument in her response, she has failed to meet her burden of identifying specific facts showing a genuine issue as to any retaliation claim.  We will thus only consider Campbell's interference claim.

C.      Campbell's Interference Claim

As our Court of Appeals has explained, in order to state a claim for interference "the employee only needs to show that [s]he was entitled to benefits under the FMLA and that [s]he was denied them."  Callison, 430 F.3d at 119 (citing 29 U.S.C. §§ 2612(a), 2614(a)).  An

FMLA interference plaintiff "need not show that [s]he was treated differently than others", and an employer "cannot justify its actions by establishing a legitimate business purpose for its decision.  An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA."  Id. at 119-120.  Again, Ragsdale limits the breadth of this cause of action, because in order to state an interference claim under the FMLA an employee must show that she was prejudiced by the employer's violation of that statute.

Here, it is undisputed that Campbell was entitled to the benefits of the FMLA, and so the question is whether JUP denied her those entitlements and whether she was prejudiced by any such denial.

Campbell argues that JUP interfered with her rights under the FMLA by "not informing her of her rights to a recertification, by not informing her of the consequences of not obtaining the recertification, denying her the full amount of time to obtain the recertification, and by terminating her before she had opportunity to obtain a recertification."  Pl. Resp. at 3.

JUP responds that Campbell cannot sustain an interference claim because she "provides no evidence of 'harm' associated with this 'failure,' as necessary to state an FMLA interference claim."  Def. Reply at 5.  Campbell has "failed to set forth any harm related directly to the fact that the end of her employment . . . was made prior to the expiration of the 15-day period."  Id. at 6.  JUP also points out that, as Campbell concedes, she was no longer caring for Maxwell after January 21, 2013 and so it argues that none of her absences after this date was FMLA-qualifying.  Id. (citing SMF ¶ 62; Pl. Resp. ¶¶ 61-106).

JUP is correct that Campbell has not suggested any way in which she was prejudiced by any alleged failure of JUP to comply with the FMLA, and so we need not reach the question of whether such FMLA violations occurred.

First, Campbell has not shown that she was prejudiced by any alleged failure to notify her of her right to a recertification or to inform her of the consequences of failing to obtain one. She was not fired for failing to obtain a recertification. She was terminated for failing to come to work or call to report her absences. Moreover, she concedes that after January 21, 2013 she was no longer caring for her husband, and so this time off would not have been covered under the FMLA even if she had obtained a recertification.

Campbell's contention that she was denied her rights under the FMLA because she was fired within the fifteen-day period for recertification fares no better. Our analysis is bolstered by the holding in Armfield, where the District Court for the Northern District of Indiana faced a cognate scenario -- there, Armfield received a note addressed to her employer from a nurse practitioner saying that she would be out of work from August 4 through August 16. On August 16, Armfield received another note from the nurse practitioner extending her leave until August 21. Armfield did not tell her employer about this extension, and on August 17 -- when Armfield didn't report to work or call in -- her absence was labeled a "no call/no show". On August 18 Armfield again failed to report to work or call to inform her employer of the reason for her absence, and this was also deemed a "no call/no show". On the basis of these and one other absence the employer fired Armfield. Armfield sued under the FMLA, claiming that she should have been given fifteen days within which to return a medical certification from her health care provider about her medical condition. The court granted summary judgment to the employer on that claim on the ground that Armfield was fired not for failing to submit a

17

certification within the required time, but for violating the "no call/no show" policy.  It contrasted the case with one in which an employee was fired during the fifteen-day window for failing to submit a certification, finding that, in Armfield's case, even if the employer decided to fire her before the fifteen-day window had closed, "there is no evidence in the record that plaintiff was harmed <u>because of</u> defendant's alleged failure to wait to make any employment decisions until the expiration of the 15-day period."  <u>Armfield</u>, 2011 WL 3022253, at * 7 (emphasis in original).

   As the court trenchantly put it, "The FMLA does not provide for a fifteen-day amnesty period wherein an employee cannot be terminated for any reason while she seeks medical certification from her health care provider."  <u>Id.</u>

   According to Campbell, she stopped going to work or calling to report her absences because she believed she had been fired based on representations by Matrix personnel during the week of January 14, 2013.  She notably does not contest that the recordings of her phone calls with Matrix show that she in fact was <u>not</u> told she was fired during those calls.  It is uncontested that Campbell did not come to work, nor did she call in to report her absences, from January 21 through January 25, 2013.  She also did not go to work or call to report her absences on January 28 or January 29, and she does not contest that she received a letter from Matrix on January 30, 2013 informing her that she was fired because of her unauthorized absences on January 28 and January 29, 2013.  In short, Campbell has shown no prejudice she suffered from a lack of notification about the certification process, nor has she shown any prejudice she suffered because she was terminated before the fifteen day period had elapsed.

> D.     <u>There Remain No Genuine Disputes as to Any Material Facts</u>

In her response, Campbell argues that "[t]here is a genuine dispute over whether Plaintiff had or had not violated any company call-out policy." Pl. Resp. at 4. In support of this assertion plaintiff's counsel writes that "Plaintiff testified she followed Defendant JUP's policy, which was calling Defendant JUP and Matrix Absence Management, Inc., each day she was absent from work. Matrix's records show Plaintiff had called every day." <u>Id.</u> This assertion contradicts plaintiff's admission as to the Statement of Material Facts the defendant submitted that she did not report to work or call Matrix to report her absences on January 21 - 25. <u>See</u> SMF at ¶¶ 65-66; Pl. Resp. at ¶¶ 61. Moreover, Campbell herself testified that she stopped calling because "I didn't feel as though I had a reason to keep calling them back if I had already been terminated." Campbell Dep. at 168:6 - 8. Where both parties agree as to a material fact, there is no genuine dispute or indeed any dispute. The record here -- including Campbell's testimony and the admissions plaintiff's counsel submitted -- shows that the parties agree that Campbell did not call on several days on which she was absent in violation of the call-out policy.[4]

Campbell further contends that "[t]here is a genuine dispute over whether [she] was terminated." Pl. Resp. at 5. This is also incorrect. Campbell has conceded that no Matrix representative told her she was fired during the week of January 14, 2013. She says that Herr told her on January 23 that "the process of termination has already been taking place", Campbell Dep. at 177:15-17. The letter of January 30, 2013, whose authenticity neither party contests, speaks for itself and records that JUP fired Campbell for not reporting to work or calling to report her absences on January 28 and January 29, 2013.

---

[4] We remind plaintiff's counsel of his obligation of candor to the tribunal under Pennsylvania Rule of Professional Conduct 3.3.

Even if we were to find from this record that Campbell was fired on January 23, 2013 -- which would be a strained interpretation of the statement that "the process of termination has already been taking place" -- this would not allow Campbell to sustain her FMLA claim because by that date Campbell concedes that she had already been absent for two days -- January 21 and January 22, 2013 -- in which she did not call Matrix to report her absence, in violation of the call-out policy, and that she was also not using those days to care for her husband, and thus it was not FMLA-qualifying leave.  The dispute between whether Campbell was fired on January 23 or January 30, 2013 -- to the extent it exists -- is thus immaterial.

## V.    <u>Conclusion</u>

Because Campbell cannot demonstrate prejudice resulting from any violations of the FMLA by JUP, and because, for the reasons stated herein, there are no remaining genuine disputes as to any material facts, we will grant JUP's motion for summary judgment.


BY THE COURT:

<u>/S/ STEWART DALZELL, J.</u>